UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                              :

DAMON SMITH,
                                              :

                           Petitioner,    :             11 Civ. 8376 (PAE)

                                              :         OPINION & ORDER

                -v-                         :

                                              :

WILLIAM A. LEE,
                                              :

                           Respondent.    :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Petitioner Damon Smith, a state prisoner proceeding *pro se*, brings a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. On April 18, 2008, after a month-long jury trial in

the Supreme Court of the State of New York, Bronx County, Smith was convicted of first-degree

manslaughter. On November 12, 2008, Judge Joseph Dawson sentenced Smith, as a persistent

violent felony offender, to a term of 25 years to life. In this petition, Smith challenges the 2008

conviction, arguing that the court failed to provide an appropriate curative instruction in response

to statements in the prosecutor's summation that Smith asserts were improper. Smith also

challenges the trial court's finding that he is a persistent violent felony offender, arguing that one

of the predicate felony convictions was obtained pursuant to an involuntary guilty plea. For the

reasons stated herein, Smith's petition is denied.

## I.   Background[1]

### A.   The 2008 Conviction

On April 18, 2008, after a month-long jury trial, the jury acquitted Smith of murder in the second degree and convicted him of manslaughter in the first degree. Tr. 1090–91. These charges relate to the death, on August 18, 2005, of Curtis Ingram. The evidence at trial was as follows.

### 1.   Evidence at Trial

#### a.   The People's Case

The People opened their case with their primary witness—Nicole Givens. Givens testified that she had known Smith and his sister Dawn for approximately 30 years, and that she considered them like her brother and sister. Tr. 50–51.

On August 18, 2005, Givens went to apartment F-33 on the third floor of 1000 Anderson Avenue, which was occupied at the time by Dawn Smith and her boyfriend, Bob McIntyre. *Id.* at 56, 59–64, 446. Givens was accompanied by Ingram, whom she had known for two years. *Id.* at 52. Givens testified that when Ingram began knocking on the apartment door, Dawn Smith yelled "get the fuck away from the door, Bob's not here." *Id.* at 65–66. Ingram continued knocking, however, and said, "just tell Bob to come to the door because . . . I know he's inside." *Id.* at 66. Ingram continued to knock for 20-30 minutes. *Id.* at 69, 246–47. Finally, the door

---

[1] The Court's account of the facts is drawn from the record, including: the transcript of Smith's April 2008 trial (Dkt. 28, 30, 23 (in that order)) ("Tr."); the transcript of Smith's 2008 persistent violent felony offender hearing (Dkt. 21) ("PVO Hearing Tr."); the transcript of Smith's 2008 sentencing (Dkt. 19) ("2008 Sent. Tr."); the transcript of Smith's 1993 guilty plea (Dkt. 16) ("1993 Plea Tr."); and the transcript of Smith's 1993 sentence (Dkt. 17) ("1993 Sent. Tr.").

2

opened and Givens could see that someone, although she could not see who,[2] was poking a stick out of the open door at Ingram. *Id.* at 69–73, 247–48. Ingram grabbed the stick and pushed it back into the apartment. *Id.* at 73, 247–48.

About a minute and a half later, Dawn emerged from the apartment with her brother, petitioner Smith. *Id.* at 74, 261. Givens testified that Smith and Dawn began attacking Ingram. *Id.* at 74. Smith carried a butcher knife in his right hand. *Id.* at 76. Ingram began to back up but continued to face the door of the apartment. *Id.* at 76, 190. Givens testified that Ingram fell on his back in the hallway about five feet from the door, and Smith began to stab him repeatedly. *Id.* at 77–78. Ingram kicked at Smith from his back. *Id.* at 80–81. Givens screamed Smith's name and told him to stop, at which point Smith looked at Givens and then stabbed Ingram again on the right side near his lung. *Id.* at 85.

Givens testified that after Smith finished stabbing Ingram, Smith ran down the stairs to the first floor of the building. *Id.* at 90–92, 267–68. Givens followed Smith down the stairs to the first floor, where she saw Smith throw the knife out a first-floor window. *Id.* at 91–93. Givens then went back upstairs to help Ingram, who had started to come down the stairs from the third floor. *Id.* at 93–94. Ingram made it out of the building before he began to throw up blood. *Id.* at 95. Givens asked someone to call an ambulance, which arrived approximately five minutes later. *Id.* at 96–97.

The People also called Trinh Dinh, a paramedic. She testified that on August 18, 2005, she responded to a radio run at 1000 Anderson Avenue at about 5:30 p.m. *Id.* at 435. When she and her partner arrived on the scene, she saw Ingram lying face down in the street next to a parked car. *Id.* Dinh and her partner carefully rolled Ingram over, put him on a stretcher, and

---

[2] Givens later testified that she could tell that Dawn was wielding the stick, because Givens recognized Dawn's hands. Tr. 261, 320–21.

3

placed him in the back of the ambulance. *Id.* at 436. Dinh and her partner cut open Ingram's

shirt, revealing multiple stab wounds. *Id.* On the way to the hospital, Ingram stopped breathing

and lost pulse. *Id.* Dinh and her partner administered chest compressions and tried to put a

breathing tube into Ingram's throat, but were unable to because of the amount of blood in his

throat. *Id.* at 436–37. Upon arrival at the hospital, Dinh and her partner transferred care to

emergency staff, who continued to administer chest compression. *Id.* at 437. They were unable

to revive Ingram. *Id.*

The People also called the Police Officers Stephen Pierce and Christopher Brady, who

responded to a radio run around 5:30 p.m. on August 18, 2005 and arrived at 1000 Anderson

Avenue approximately three minutes later. *Id.* at 331–33, 376. Officer Pierce testified that when

he arrived at the scene, three ambulances were already there and paramedics were caring for a

black male bleeding heavily from the body. *Id.* at 334; *accord id.* at 377. The officers testified

that Givens was on the scene, and was "hysterical," *id.* at 335, and "distraught," *id.* at 377.

Givens then led Officers Pierce and Brady to an alley next to 1000 Anderson Avenue where she

pointed out a knife lying on the ground. *Id.* at 337. The officers could not immediately access

the alley so they followed Givens into the building, where she showed them the first-floor

window through which she said Smith had thrown the knife; the officers could see the knife

lying in the alley. *Id.* at 338. Officer Pierce then followed Givens upstairs to view the crime

scene, *id.* at 339, while Officer Brady recovered the knife from the alley, *id.* at 341, 378. Officer

Brady placed the knife in a paper bag and gave it to another officer. *Id.* at 342, 378–79.

Dr. Margaret Prial, an expert in the field of anatomic and forensic pathology employed by

the Office of the Chief Medical Examiner of the City of New York in the Bronx, performed an

autopsy on Ingram on August 19, 2005, the day after his death. *Id.* at 381–85. Dr. Prial

4

identified 12 stab wounds on Ingram's body, but could not determine in which order the wounds had been inflicted.[3]  *Id.* at 388.  Dr. Prial testified that two stab wounds caused Smith's death: one to the left side of his chest that went through his lung and pulmonary artery, the other to his left arm that was three inches deep.  *Id.* at 407–08.  In other words, Dr. Prial testified, Ingram "bled to death."  *Id.* at 409.  Upon cross-examination, Dr. Prial conceded that had the wound to Ingram's left arm been treated right away, "[i]t's more likely than not that it would have been non-fatal," *id.* at 412, whereas the stab wound to Ingram's left chest was definitively fatal, *id.* at 409.  Ingram also suffered five non-fatal stab wounds on his thighs and left lower leg, a smaller wound on his left upper arm, a deep "chopping wound" to his lower left leg that caused the bone to break, a stab wound to the right lower back, and two shallower wounds to his left upper arm and left forearm.  *Id.* at 392–97.  Dr. Prial testified that these wounds were consistent with the knife that was recovered at the scene.  *Id.* at 406.  Dr. Prial also testified that Ingram had suffered abrasions to his chin and left forearm that had been inflicted within 24 hours of his death and were consistent with a "wooden object" or "a stick" hitting him.  *Id.* at 397–99.

### b.    The Defense's Case

Smith testified in his own defense.  He testified that, at the time of the trial, he was 41 years old.  He admitted that he had been convicted of three felonies and at least four misdemeanors.  Tr. 446.  Smith explained that his sister Dawn lived at the apartment at 1000 Anderson Avenue where the incident occurred and that he typically visited the apartment two to three times per week.  *Id.* at 446–47.  Smith admitted that he had stabbed Ingram, but claimed that he had acted with justification—he wanted to get Ingram out of his sister's house and to prevent him from beating her.  *Id.* at 470, 483.

---

[3] For the purposes of her examination of Ingram's body, Dr. Prial numbered the wounds 1 to 12, but these numbers do not correspond to the order in which they were inflicted.  Tr. 388.

Smith testified that he feared Ingram because Ingram had a reputation for being a loanshark, and that the first time Smith saw Ingram, the latter was "loansharking money to Bob [McIntyre, Dawn's boyfriend]." *Id.* at 499–500. Smith also testified that a year and a half prior to Ingram's death, Smith saw Ingram "beating up some female. He was hitting the female in the face with his fist. The female was screaming 'I will get your money, Curtis. I will get your money. Please don't hit me no more.'" *Id.* at 474. Smith also testified that, on another occasion, he saw Ingram come up to another customer in a store and "knock[] some money out of [the customer's] hand. When the dude went [to] protest, Curtis hit him twice and said 'you owe me.'" *Id.* at 475.

Smith testified that on the day of the incident, he was lying on the couch of his sister's apartment around 5:30 p.m. when he heard loud banging on the door. *Id.* at 458–59. Dawn asked who was at the door, and Smith heard a male voice reply "open the door, Dawn, I'm here to see Bob." *Id.* at 459. Dawn replied: "Bob's not here, Curtis, he's out on the street, go out on the street and find him." *Id.* Ingram continued to bang on the door, saying: "I know Bob's in there, I'm going to keep on banging until you let me in. . . . I'm going to kick the locks off the hinges, open the f'n door, Dawn." *Id.* at 459–60; *accord id.* at 544. After approximately 30 or 40 minutes of persistent banging, Smith testified, his sister said "I'm tired of this," and opened the front door to tell Ingram to leave. *Id.* at 461–62. Smith testified that he then heard a "smacking sound," followed by Dawn saying "oh" and the sound of shuffling feet "like somebody else [was] pushing inside the apartment." *Id.* at 461–62; *see also id.* at 547, 549–50; 557. At that point, Smith jumped up and grabbed the first knife he saw in the kitchen—the same knife later recovered by the police. *Id.* at 462. When Smith ran to the door he saw Ingram standing over his sister and he heard Dawn say to Ingram, "oh, you hit me." *Id.* at 463. Smith

6

told Ingram: "[Y]o, get the fuck up off my sister, why you hit my sister," to which Ingram

replied "fuck your sister" and raised his right hand as if to hit Smith. *Id.* Smith then stabbed

Ingram. *Id.* Smith testified that this initial stab wound was the one that Dr. Prial identified as the

fatal wound. *Id.* at 464.

    Smith and Ingram then struggled in the doorway and outside the apartment—Ingram was

"throwing punches," while Smith "would jab the area where [Ingram] was trying to punch

[him]." *Id.* at 466–67. Smith testified that eventually he and Ingram grew tired and the struggle

ceased. *Id.* at 469. Smith went downstairs, threw the knife on the windowsill, and went out of

the building. *Id.* at 470, 473. The next day, Smith surrendered to the police. *Id.* at 470.

    The defense called no other witnesses. In rebuttal, the People called five witnesses who

testified to Ingram's reputation for peacefulness. *See id.* at 712–65.

### c.   The Prosecutor's Summation

    During closing arguments, the prosecutor frequently referenced the number of stab

wounds inflicted. He opened his statement: "[L]adies and gentlemen of the jury: Twelve

wounds to the body of Curtis Ingram; 12 stab incisions and a chop wound." Tr. 849. He

returned to the theme to argue that the number of wounds made the justification defense

implausible:

> Twelve wounds to the body of Curtis Ingram; 12 stabs incisions and a chop
> wound. Defendant's defense is that he was justified in inflicting these wounds as
> he was defending his sister's apartment from a burglary or attempted burglary, an
> apartment that his sister, Dawn Smith, was in at the time. . . . Twelve cuts by a
> knife, claim of justification. Based on the evidence you heard and you didn't
> hear, how can 12 stabs, incisions and a chop wound be justified?

*Id.* at 849–51.[4] He returned to the point again:

---

[4] Defense counsel objected during this passage to the prosecutor's comment (omitted here) about
a missing witness—an issue not relevant to this petition. Defense counsel did not object to the
statements regarding the number of stab wounds. *See* Tr. 849–51.

The testimony of the stab wounds, even the fatal one, went two inches deep, but other wounds are three or four inches deep into Curtis Ingram's body. That's not a quick jab. That's a thrust. He is thrusting the knife into Curtis Ingram deliberately with no justification . . . . [H]e tells you that Curtis Ingram is raising his leg and this is after he's already been stabbed with that fatal wound a few minutes earlier, he still has the strength to try and stomp the defendant in the face with his foot all the way up, he's raising it, and he's able not only to just ward him off with that quick jab, to chop him, cause the chop wound, he hits that leg so hard he breaks the underlying bone. The tibia is broke from the force of that blow. This is not a jabbing. This is not him trying to stop Curtis from kicking him. This is the defendant savagely attacking an unarmed man.

*Id.* at 866–67; *see also id.* at 874 ("Curtis is cut twelve times."). Defense counsel did not object

to these statements.

Later in his summation, the prosecutor, Mr. Weil, made several statements regarding the

law of justification to which defense counsel, Mr. Cantor, did object, resulting in the following

colloquy:

> MR. WEIL: [W]hat did this defendant actually believe, what is he making up and what's the truth? And if he's making up the story about the punch and trying to prevent a burglary, then he didn't actually believe it and there's no justification. The next hurdle is . . . did the defendant act in a reasonable manner, the objective part. Would a reasonable person, not the defendant, not a man with his background, but a reasonable person act in the manner that the defendant did? Would a reasonable person have believed that deadly physical force, the use of this knife was an appropriate response to what was going on?
> MR. CANTOR: Objection.
> THE COURT: The Court will instruct you on the elements of justification. Go on.
> MR. WEIL: Would a reasonable person have done that before checking out—
> MR. CANTOR: Objection.
> . . .
> THE COURT: I told you you can refer briefly to my instructions.[5]  You're going beyond a brief reference. That's why I'm going to sustain the objection.
> . . .

---

[5] Before summations, the court held a charging conference, *see* Tr. 770–816, which included an exchange on the defense of justification, *id.* at 782–84. During that conference, the parties also discussed a passage of the instruction that Judge Dawson described as "my way of saying, look, although I'm the judge of the law, the lawyers are allowed to briefly, briefly, briefly refer to portions of the charge." *Id.* at 780. Both parties agreed that this instruction should be included. *Id.* at 779–80.

> MR. WEIL: Based on what you've heard, the justification defense, I submit to
> you, has been overcome. I've met my burden of proof in disproving it.
> MR. CANTOR: Objection, unless he says beyond a reasonable doubt.
> THE COURT: Okay. I'm going to instruct you on the elements. I'm going to
> instruct you on reasonable doubt. It's the People's burden to disprove
> justification beyond a reasonable doubt. Go on.

*Id.* at 887–90. At no point during this colloquy did defense counsel request a curative instruction

or move for a mistrial. Shortly thereafter, the prosecutor completed his summation and the court

charged the jury.

### d.    The Court's Instructions

The court began its jury instructions by reminding the jury that the parties' summations

are not evidence and that the jury must accept the law as the court instructs. Tr. 894–95. With

regard to the defense of justification, the court instructed the jury as follows:

> The defendant is charged with Murder in the Second Degree and Manslaughter in
> the First Degree. With respect to both counts, the defendant has raised the
> defense of justification. Before instructing you on the law with respect to those
> two charges, I will first instruct you on the defense of justification. With respect
> to count one, Murder in the Second Degree; and count two, Manslaughter in the
> First Degree, one of the elements that the People must prove beyond a reasonable
> doubt is that the defendant was not justified. The defendant is not required to
> prove that he was justified; the People must pro[ve] that he was not. . . . Under
> our law, a person in possession or control of or licensed or privileged to be in a
> dwelling or an occupied building who reasonably believes that another individual
> is committing or attempting to commit a burglary of such dwelling or occupied
> building, may use deadly physical force upon that individual when he or she
> reasonably believes such to be necessary to prevent or terminate the commission
> or attempted commission of such burglary.

*Id.* at 916–17; *see also id.* at 898 ("[B]efore you can find the defendant guilty of a crime, the

People must prove beyond a reasonable doubt every element of the crime . . . and disprove

beyond a reasonable doubt the defense of justification."). When given the opportunity at the end

of instructions, neither party raised any objections, other than those that had already been raised

at the charging conference. *Id.* at 931–32. The court later repeated the entirety of the jury

charge in response to a jury note. *Id.* at 1031–62. As noted, the jury convicted Smith of

manslaughter in the first degree and acquitted him of murder in the second degree. *Id.* at 1090.

### 2. Sentencing

On October 16, 2008, the trial court held a hearing to determine whether Smith was a

persistent violent felony offender under New York law—an issue which defense counsel

contested. *See* PVO Hearing Tr. 1–36; 2008 Sent. Tr. 1–12;[6] *see also* N.Y. Crim. P. Law

§ 400.16 (setting forth procedure for determining whether defendant is a persistent violent felony

offender). The trial court found that Smith was a persistent violent felony offender, based on: (1)

Smith's July 13, 1993 conviction, pursuant to a guilty plea, for criminal possession of a weapon

in the second degree, *see* 2008 Sent. Tr. 8–10; *see also* 1993 Plea Tr.; and (2) Smith's October 8,

1986 conviction for robbery in the second degree, *see* 2008 Sent. Tr. 10–11. The court noted

that it had reviewed the transcript of the 1993 plea and sentencing and found no constitutional

defects. *Id.* at 9.

After hearing statements from counsel, Ingram's family members, and Smith, the court

sentenced Smith to 25 years to life. *Id.* at 20.

### 3. Direct Appeal

On direct appeal, Smith argued that the prosecutor's frequent remarks about the number

of stab wounds and his comments regarding the law of justification were improper, such that the

trial court's failure to issue a curative instruction caused the jury to improperly reject Smith's

justification defense. *See* Dkt. 40-1, at 20–29 (Smith's brief on direct appeal).[7] Smith, who was

---

[6] The PVO Hearing was continued on November 12, 2008, and therefore also includes the first
12 pages of the document referred to herein as the "2008 Sent. Tr."

[7] Smith's theory at trial and on appeal was that the number of stab wounds was irrelevant to his
justification defense: Although Dr. Prial was unable to determine the order of the stab wounds,
she did identify the one to Ingram's left chest as having been fatal, *see* Tr. 407–09, and Smith

represented by new counsel on appeal, also argued in a footnote that "[g]iven counsel's sustained

devotion to establishing that [Smith] was justified in the attack, his failure to have protested the

prosecutor's wrongful arguments and to seek curative instructions was surely unintentional. But

should this Court fault counsel . . . counsel's inaction would warrant a finding of ineffective

assistance of counsel." *See* Dkt. 40-1, at 29 n.6.

On June 1, 2010, the Appellate Division, First Department, affirmed Smith's conviction.

*People v. Smith*, 74 A.D.3d 441 (1st Dep't 2010). In a succinct opinion, it held: "[Smith] did

not preserve his claims that the prosecutor's summation misstated the law of justification and

that the court should have given a curative instruction, and we decline to review them in the

interest of justice." *Id.* at 441. The court also stated:

> As an alternative holding, we find that the remarks at issue were fair comment on
> the evidence and a proper response to the arguments of defense counsel. The
> prosecutor did not claim that the number of stab wounds inflicted by [Smith]
> automatically negated his justification defense as a matter of law. Instead, he
> highlighted the number of wounds in making a factual argument that the jury
> should reject defendant's self-defense claim.

*Id.* Finally, the court noted that "[w]e have considered and rejected defendant's ineffective

assistance of counsel argument." *Id.*

On August 10, 2010, the New York Court of Appeals denied Smith leave to appeal.

*People v. Smith*, 15 N.Y.3d 810 (2010). Smith did not file a petition for a writ of certiorari to the

Supreme Court of the United States.

---

testified that this was the first wound he inflicted, *see id.* at 464. Thus, Smith's argument went,
the additional 11 wounds did not defeat Smith's entitlement to a justification defense, because
they were not were not the cause of death. *See* Dkt. 40-1, at 24 (citing, *inter alia*, *People v.
Carrera*, 282 A.D.2d 614, 615–16 (2d Dep't 2001)); Tr. 832. However, Dr. Prial also testified
that there was a second fatal wound, *see* Tr. 407–08, 412, and that she could not establish the
order in which the 12 wounds had been inflicted, *id.* at 388.

**B.     Procedural History**

On November 17, 2011, the Court received Smith's petition.  Dkt. 2 ("Petition").  On

January 25, 2012, respondent filed a motion to dismiss the petition pursuant to Federal Rule of

Civil Procedure 12(b)(6), arguing that the petition is untimely because it was not filed within the

one-year statute of limitations set forth in 28 U.S.C. § 2244(d).  Dkt. 11.  On July 24, 2012, this

Court denied respondent's motion to dismiss, finding that although respondent had made a strong

circumstantial argument that Smith's petition had not been timely delivered to prison officials,

the Court could not conclude, at that early stage, that Smith's petition was indeed untimely.  *See*

Dkt. 36 ("Opinion & Order"), at 6.  This Court noted, however, that respondent was at liberty to

renew this argument at a later date if supporting evidence could be adduced.  *Id.* at 7.

On October 22, 2012, respondent filed an answer in opposition to Smith's petition.  Dkt.

40 ("Resp. Ans.").  Respondent argues that (1) the petition is untimely, *id.* at 4–10; (2) the First

Department denied Smith's claim on adequate and independent state grounds, *id.* at 11–15; and

(3) the First Department's alternative holding that Smith's claim was deficient on the merits was

not contrary to or an unreasonable application of clearly established federal law, *id.* at 15–23.

On January 9, 2013, Smith filed an affirmation in reply.  Dkt. 42 ("Pet. Reply Aff.").

**II.     Discussion**

**A.     Timeliness of the Petition**

"[A] person in custody pursuant to the judgment of a State court" may petition a federal

court for a writ of habeas corpus "on the ground that he is in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Antiterrorism

and Effective Death Penalty Act of 1996 ("AEDPA") introduced a limitations period with

respect to habeas petitions and motions to vacate federal sentences.  28 U.S.C. § 2244(d); *see*

*Ross v. Artuz*, 150 F.3d 97, 99 (2d Cir. 1998). That period, with certain variations not relevant

here, ends one year after the date on which the petitioner's conviction became final. 28 U.S.C.

§ 2244(d); *Ross*, 150 F.3d at 98. The limitations provision reads, in relevant part:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>> (A) The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . .

28 U.S.C. § 2244(d). Reading § 2244(d)(1)(A) and Supreme Court Rule 13(1) together, a

conviction becomes final 90 days after the highest state court affirms the conviction, assuming

no petition for a writ of certiorari is filed. *See Ross*, 150 F.3d at 98.

The AEDPA limitations period is not jurisdictional; rather, it is an affirmative defense,

and therefore the burden of establishing that the petition is untimely rests on respondent. *See*

*Acosta v. Artuz*, 221 F.3d 117, 121–22 (2d Cir. 2000); *Azaz v. Artus*, No. 09-CV-3857

(KAM)(SMG), 2012 WL 5289519, at *3 (E.D.N.Y. Oct. 19, 2012).

### 1. Application

This Court has already determined that Smith's conviction became final on November 8,

2010, and therefore that the AEDPA limitations period ended on November 8, 2011. *See*

Opinion & Order 4. Because Smith filed his petition *pro se* while incarcerated, the "prison

mailbox" rule applies, meaning his petition is deemed filed on the date he handed it to the prison

officials to be mailed to this Court. *See Houston v. Lack*, 487 U.S. 266, 270–71 (1988); *Noble v.*

*Kelly*, 246 F.3d 93, 97–98 (2d Cir. 2001). Here, the Court received Smith's petition on

November 17, 2011, *see* Dkt. 2, but the petition is undated, and perforce does not reveal when

Smith handed it to prison officials.

In initially moving to dismiss the petition as untimely, respondent offered two pieces of

circumstantial evidence in support of its argument that Smith handed the petition to prison

13

officials after November 8, 2011: (1) the United States Postal Service website states that it takes two days for mail to travel from the correctional facility where Smith is held to this Court; and (2) an *in forma pauperis* ("IFP") petition from Smith dated November 10, 2011—two days after the deadline—was received by the Court the same day as the habeas petition.[8] *See* Opinion & Order 5. At the motion to dismiss stage, the Court declined to hold that Smith's petition was untimely, noting that "it is not outside the realm of possibility that Smith timely gave prison officials his petition, and that the additional nine days passed before receipt at the Court as a result of (1) a delay by prison officials in placing his petition in the mail; and/or (2) a delay in mail delivery." *Id.* at 6.[9] However, the Court also noted that respondent was at liberty to reassert this argument if it could adduce further evidence bearing on the date Smith delivered his petition to prison officials. *Id.* at 7.

With the benefit of further evidence on the point, the Court now concludes that Smith delivered his petition to prison officials some time on or after November 10, 2011, together with his IFP application—in other words, at least two days late. On November 10, 2011, Smith filled out a "Disbursement or Refund Request" form so that he could send certified mail to this Court. *See* Resp. Ans. Ex. 5. Although the form does not specify what papers Smith included in that mailing, November 10, 2011 was the first time that month that Smith had purchased any postage. *See* Resp. Ans. Ex. 4 (Smith's November 2011 transaction statement). On November 14, Smith's disbursement request was carried out, such that $7.23 was deducted from his inmate

---

[8] Respondent also argued that no extraordinary grounds for relief exist that would toll the limitations period. *See* Opinion & Order 5.

[9] Smith also argued that the state collateral application to vacate his 1993 conviction, which he filed in June 2011 in Supreme Court, Bronx County, should toll the AEDPA limitations period. However, this Court held that because the application challenged only Smith's 1993 conviction, it did not statutorily toll the limitations period for his 2008 conviction. *See* Opinion & Order 6 (citing 28 U.S.C. § 2244(d)(2)).

account for postage. *Id.* On November 17, the Court received a single large envelope, stamped certified mail and bearing a postage price of $7.23. *See* Dkt. 43.[10] Although it is not apparent whether one or both documents were included in that envelope, the Court has only one envelope in its records, it is unlikely that the two-page IFP application would have cost $7.23 to mail by itself, and there is no indication that Smith had recently purchased any other postage. Therefore, on the basis of this circumstantial evidence, the Court concludes that Smith mailed the habeas petition and the IFP application together in the envelope received on November 17, 2011. Because Smith dated the IFP application November 10, 2011, he necessarily could not have delivered that document —and, hence, his habeas petition—to prison officials on or before November 8, 2011.

Although this evidence is not conclusive, the Court finds that respondent has satisfied its burden of establishing that Smith's petition is untimely. *See Acosta*, 221 F.3d at 121–22. The Court finds it significant that, despite having submitted a lengthy reply to respondent's answer, Smith does not attest that he handed his petition to prison officials on or before November 8, 2011. Rather, he argues that the limitations period should be subject to equitable tolling. *See* Pet. Reply Aff. ¶¶ 4–7. Accordingly, the Court finds that Smith's petition was submitted outside of the one-year limitations period, and turns to Smith's argument that the period should be tolled.

### 2.     Equitable Tolling

To be entitled to equitable tolling of the AEDPA limitations period, Smith must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

---

[10] This envelope should have been scanned and posted to the docket along with the documents that it contained when those documents were first posted. That it was not was an oversight by the Court. Because Smith is the sender of this envelope, however, he is not prejudiced by the Court's failure to do so at an earlier stage of the proceedings; respondent, the party who might have benefited from knowing this information at an earlier stage of the proceedings, has nevertheless prevailed.

circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The Second Circuit "has clearly stated that the AEDPA limitations period will only be tolled in 'rare and exceptional circumstance[s].'" *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)). The petitioner must "demonstrate a causal relationship between the extraordinary circumstances . . . and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding." *Id.* (alteration omitted) (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)). "The term 'extraordinary' does not refer to the uniqueness of the petitioner's circumstances, 'but rather how severe an obstacle it is for the prisoner endeavoring to comply with AEDPA's limitations period.'" *Id.* at 231–32 (quoting *Diaz v. Kelly*, 515 F.3d 149, 154 (2d Cir. 2008)). "Instances which justify equitable tolling include a corrections officer's intentional confiscation of a prisoner's petition shortly before the filing deadline, . . . a state appellate court's failure to inform a prisoner that his leave to appeal was denied, . . . and . . . an attorney's failure to file a habeas petition on behalf of a prisoner, despite explicit directions from the prisoner to do so." *Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011) (citations omitted).

Smith argues that two extraordinary circumstances prevented him from filing his petition on time: (1) the lack of legal assistance he received from Mr. Luis Franco, the Deputy Supervisor at the law library at Green Haven Correctional Facility; and (2) Smith's mental illness. Pet. Reply Aff. ¶ 5. Neither argument prevails.

First, to the extent Smith suggests that he should have been provided with counsel, the Court notes that there is no right to counsel in habeas proceedings. *See Pennsylvania v. Finley*,

481 U.S. 551, 555 (1987); *Harris v. United States*, 367 F.3d 74, 77 (2d Cir. 2004).  To the extent

Smith is arguing that Mr. Franco's "lack of cooperation" constituted a state-created impediment,

this argument fares no better.  "It is extremely rare for courts to find a state-created impediment

is extraordinary enough to warrant equitable tolling." *Artis v. Hulihan*, No. 09 Civ. 9893

(BSJ)(JCF), 2010 WL 4668926, at *4 (S.D.N.Y. Nov. 12, 2010).  Smith's claim that a law

librarian failed to assist him with his petition is not such an impediment. *See Adames v. Artus*,

No. 10 Civ. 398 (DAB)(HBP), 2011 WL 813627, at *6 (S.D.N.Y. Jan. 20, 2011), *report and

recommendation adopted by* 2011 WL 814631 ("The lack of inmate law clerks to assist

petitioner in preparing his petition is not a basis for an equitable toll because there is no absolute

right to counsel or other legal assistance in connection with a habeas corpus petition."); *cf. id.*

(ignorance of the law is generally insufficient to warrant equitable tolling); *Artis*, 2010 WL

4668926, at *4 (same).

Second, although Smith is correct that mental illness can serve as the basis for equitable

tolling under appropriate circumstances, "mental illness does not toll a filing deadline *per se*."

*Bolarinwa*, 593 F.3d at 232.  Rather, "whether equitable tolling is warranted in a given situation

is a highly case-specific inquiry." *Id.* (citation omitted).  The burden of demonstrating the

appropriateness of equitable tolling lies with the petitioner, and to meet this burden Smith "must

offer a 'particularized description of how [his] condition adversely affected [his] capacity to

function generally or in relationship to the pursuit of [his] rights.'" *Id.* (quoting *Boos v. Runyon*,

201 F.3d 178, 185 (2d Cir. 2000)).

Here, Smith's reply affirmation attaches three documents that are relevant to his claim of

mental illness.  The first is a letter from Bronx-Lebanon Hospital Center, dated March 17, 2004,

notifying Smith that he would be unable to attend the Ogden Family Medical Clinic for routine

care in the future due to his "disruptive behavior." Pet. Reply Aff. Ex. A. Smith also provides

two notarized statements, one from his sister Dawn and one from his mother. His sister attests

that Smith was placed on mental health medication when he was released from Midstate

Correctional Facility. *Id.*[11] His mother provides more detail, stating that Smith was on mental

health medication in August 2005 at the time of the incident; that Smith was at some point

admitted to Montefiore mental health unit where he was "medicated and underwent intensive

screening"; and that when Smith was released from Montefiore he remained under his mother's

care from 2001 to 2005. *Id.*

Although these submissions suggest that Smith has indeed struggled with mental health

issues, they are insufficient to warrant equitable tolling. They offer little detail as to the severity

of Smith's condition and how (if at all) it affected his capacity to function generally or in relation

to the pursuit of his rights. *See Bolarinwa*, 593 F.3d at 232. The assertion—made by both his

sister and mother—that Smith took mental health medication is insufficient on its own to warrant

equitable tolling. *See Alaoule v. Ercole*, No. 08 Civ. 3277 (BSJ)(AJP), 2009 WL 2001741, at *3

(S.D.N.Y. July 9, 2009); *Jean-Louis v. Greiner*, No. 02 Civ. 6326 (SAS), 2003 WL 1807144, at

*3 (S.D.N.Y. Apr. 4, 2003) (noting that the "statement that petitioner takes psychotropic

medication does not satisfy his burden to show that this medication left him incapacitated or

otherwise unable to pursue his rights"); *see also De Los Santos v. Ercole*, No. 07 Civ. 7569

(KMK)(PED), 2013 WL 1189474, at *5–7 (S.D.N.Y. Mar. 22, 2013) (no equitable tolling where

petitioner had been housed in psychiatric unit while in prison, had taken psychotropic

medication, and submitted psychiatric records describing major depression and hallucinations

but also signs of improvement); *Madison v. Hulihan*, No. 09-cv-337 (DLI), 2012 WL 1004780,

---

[11] Although Dawn's statement does not specify when this was, the record reflects that Smith was
released from Midstate Correctional Facility on August 29, 2001. *See* Dkt. 11-6, at 34.

at *2–4 (E.D.N.Y. Mar. 23, 2012) (no equitable tolling where petitioner submitted records showing that he took psychotropic medications because of mental distress and difficulty sleeping, and asserted that he experienced incapacitation and blackouts). And even assuming that the severity of Smith's mental condition at *some* point had been sufficiently established, Smith's submissions offer no detail as to Smith's condition during the relevant time period—*i.e.*, between November 8, 2010, when the limitations period began to run, and November 2011, when he submitted his untimely petition. *See Rios v. Mazzuca*, 78 F. App'x 742, 744 (2d Cir. 2003) (summary order) (no equitable tolling where petitioner had suffered in the past from chronic and debilitating mental illness, had been diagnosed with schizophrenia, and had attempted suicide, but had produced no documentation that during the period he sought to toll "he was so incapable of rational thought that he could not appreciate his situation"); *De Los Santos*, 2013 WL 1189474, at *5 (petitioner must show mental illness severely impaired his ability to pursue his legal rights during the time petitioner seeks to toll); *Madison*, 2012 WL 1004780, at *3 (same); *Artis v. Hulihan*, No. 09 Civ. 9893 (BSJ)(JCF), 2012 WL 555149, at *6 (S.D.N.Y. Jan. 30, 2012) (same). The letter regarding Smith's "disruptive behavior" was dated March 17, 2004; his mother's letter refers to Smith's mental illness prior to 2005; and Dawn's letter specifies no time period but appears to relate to 2001. Thus, there is no indication whether Smith continued to suffer from mental illness during the relevant period, and, if so, whether it was sufficiently severe to warrant equitable tolling.

For these reasons, equitable tolling is not appropriate here. Smith's habeas petition is untimely.

### B.    Adequate and Independent State Grounds

Respondent alternatively argues that, even if Smith's petition were not time-barred, the

First Department's decision rests on adequate and independent state grounds so as to bar federal

habeas review. Resp. Ans. 11–15. The Court agrees.

"A federal habeas court will not review a claim rejected by a state court 'if the decision

of [the state] court rests on a state law ground that is independent of the federal question and

adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (quoting *Coleman*

*v. Thompson*, 501 U.S. 722, 729 (1991)). "This rule applies whether the state law ground is

substantive or procedural." *Coleman*, 501 U.S. at 729. "However, the state law ground is only

adequate to support the judgment and foreclose review of a federal claim if it is 'firmly

established and regularly followed' in the state." *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir.

2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

"[I]n certain limited circumstances, even firmly established and regularly followed state

rules will not foreclose review of a federal claim if the application of the rule in a particular case

is 'exorbitant.'" *Id.* at 713–14 (quoting *Lee*, 534 U.S. at 376). "Since the adequacy of a state

procedural bar to the assertion of a federal question is itself a federal question, [the court] must

ascertain whether the state rule at issue . . . is firmly established and regularly followed, and

further whether application of that rule in this case would be exorbitant. To do so, [the court]

looks at the statute and case law construing it." *Id.* at 714 (citations omitted).

Finally, the adequate and independent grounds doctrine does not bar relief where "the

prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that failure to consider the claims will result in a

fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750; *accord Trevino v.*

*Thaler*, No. 11-10189, 2013 WL 2300805, at *6 (May 28, 2013); *McQuiggin v. Perkins*, No. 12-

20

126, 2013 WL 2300806, at *7 (May 28, 2013); *Hawthorne v. Schneiderman*, 695 F.3d 192, 198

(2d Cir. 2012); *Rivas v. Fischer*, 687 F.3d 514, 550 (2d Cir. 2012).

### 1.   New York State Procedural Bar

Here, the First Department upheld Smith's conviction on the grounds that Smith "did not

preserve his claims that the prosecutor's summation misstated the law of justification and that the

court should have given a curative instruction, and we decline to review them in the interest of

justice." *People v. Smith*, 74 A.D.3d 441, 441 (1st Dep't 2010).  Although the First Department

did not elaborate, respondent argues that its decision relied on the grounds set forth in

respondent's appellate brief—namely, that Smith had failed to comply with New York's

contemporaneous objection rule.  *See* Dkt. 40-2, at 31–32 (respondent's brief on direct appeal).

The Court agrees that the language of the First Department's short opinion sufficiently shows

that it "actually . . . relied on the procedural bar as an independent basis for its disposition of the

case." *Harris v. Reed*, 489 U.S. 255, 261 (1989) (citation omitted); *see Garcia v. Lewis*, 188

F.3d 71, 77 (2d Cir. 1999) ("There is no question that the Appellate Division's explicit

invocation of the [contemporaneous objection] procedural bar constitutes an 'independent' state

ground, even though the court spoke to the merits of [petitioner's] claim in an alternative

holding." (citation omitted)).  Thus, the question here is "whether the state ground relied upon is

'adequate' to preclude federal habeas review." *Garcia*, 188 F.3d at 77.

New York's "contemporaneous objection" or "preservation" rule provides that:

> For purposes of appeal, a question of law with respect to a ruling or instruction of
> a criminal court during a trial or proceeding is presented when a protest thereto
> was registered, by the party claiming error, at the time of such ruling or
> instruction or at any subsequent time when the court had an opportunity of
> effectively changing the same. . . . [It] is sufficient if the party made his position
> with respect to the ruling or instruction known to the court, or if in re[s]ponse to a
> protest by a party, the court expressly decided the question raised on appeal.  In
> addition, a party who without success has either expressly or impliedly sought or

> requested a particular ruling or instruction, is deemed to have thereby protested
> the court's ultimate disposition of the matter or failure to rule or instruct
> accordingly sufficiently to raise a question of law with respect to such disposition
> or failure regardless of whether any actual protest thereto was registered.

N.Y. Crim. P. Law § 470.05(2); *see People v. Robinson*, 36 N.Y.2d 224, 228 (1975) (issue not

preserved for appeal where party claiming error failed to object to jury charge at a time when the

error complained of could readily have been corrected); *People v. Crique*, 63 A.D.3d 566, 567

(1st Dep't 2009) ("[D]efendant did not preserve his claim that the court should have charged the

jury that if it found defendant was initially justified but used excessive force, a conviction would

also require a finding that the excessive portion of the force caused the victim's death.").

Although a court should disregard state procedural rules that are "not always clear or

closely hewn to," or where a petitioner "could not fairly be deemed to have been apprised of the

rule's existence," *Lee*, 534 U.S. at 389–90, that is not the case here. Rather, the Second Circuit

has "observed and deferred to New York's consistent application of its contemporaneous

objection rules." *Garcia*, 188 F.3d at 79 (citing *Bossett v. Walker*, 41 F.3d 825, 829 n.2 (2d Cir.

1994), and *Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir. 1991)); *see Richardson v.

Greene*, 497 F.3d 212, 219 (2d Cir. 2007) ("[I]n accordance with New York case law,

application of the state's preservation rule is adequate—*i.e.*, firmly established and regularly

followed."); *see also Charlemagne v. Goord*, No. 05 Civ. 9890 (DAB)(HBP), 2008 WL

2971768, at *6–7 (S.D.N.Y. June 30, 2008), *report and recommendation adopted by* 2011 WL

2150646 (finding New York contemporaneous objection rule an adequate and independent state

ground where defendant failed to object to prosecutor's comments during summation and request

curative instruction or move for a mistrial). The First Department thus relied on an adequate and

independent state ground—Smith's procedural default in failing to contemporaneously object to

the trial court's failure to issue a curative instruction regarding the prosecutor's allegedly improper statements.

### 2.    Exorbitant Application of State Law

Although New York's contemporaneous objection rule is generally applicable, this does not end the inquiry: "There are . . . exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376. Put differently, "the adequacy of a state procedural bar is determined with reference to the 'particular application' of the rule; it is not enough that the rule 'generally serves a legitimate state interest.'" *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee*, 534 U.S. at 387). The Second Circuit has recited three factors to be "used as guides in evaluating the state interest in a procedural rule against the circumstances of a particular case." *Garvey*, 485 F.3d at 714 (citing *Lee*, 534 U.S. at 381–85). They are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Id.* (quoting *Cotto*, 331 F.3d at 240); *see also Cotto*, 331 F.3d at 240 (describing these factors as "guideposts"). Applying these guideposts here, the Court finds that the First Department's reliance on the contemporaneous objection rule was not an exorbitant application of state law.

The first guidepost is "less applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." *Cotto*, 331 F.3d at 242; *accord Garvey*, 485 F.3d at 719. However, the court may still ask whether perfect compliance with the state rule would have changed the trial court's decision. *Garvey*, 485 F.3d at 719. Although "the likely impact of a timely objection involves a certain degree of

23

speculation," the Second Circuit has noted that "the purpose of the contemporaneous objection rule is to give the trial court a clear opportunity to correct any error," and therefore a timely objection raises the possibility that the trial court would have come to a different conclusion after argument or briefing. *Cotto*, 331 F.3d at 243; *accord Garvey*, 485 F.3d at 719. Here, although Smith did object to the prosecutor's statements that touched on the law of justification, at which point the court stated that it would instruct the jury on the relevant law during jury instructions, *see* Tr. 887–90, Smith did not object to the court's instructions regarding justification and never requested any specific curative instruction, either during summations or when given the opportunity at the close of jury instructions, *id.* at 931–32. Thus, although the trial court was apprised of Smith's general objection to certain statements in the prosecutor's summation, a fact which mitigates the need for perfect compliance with the procedural rule, *see Cotto*, 331 F.3d at 242–43, Smith's failure to object to the content of the court's instructions on justification or request any different instruction prevented the court from addressing head-on the issue Smith now raises. Whether or not that failure would have changed the outcome, it weighs against a finding of exorbitant application here. *See Garvey*, 485 F.3d at 719.

Second, compliance with the contemporaneous objection rule is demanded in the specific circumstances presented here. "A substantial line of New York cases" applies the rule that "where improper remarks by the prosecutor are alleged, defendant's failure to request appropriate instructions or a mistrial bars appellate review of such claims." *Reardon v. Richardson*, 956 F.2d 391, 391 (2d Cir. 1992); *see People v. Medina*, 53 N.Y.2d 951, 953 (1981) (defendant failed to preserve claim of prosecutorial misconduct where trial court sustained defendant's objections to prosecutor's statements during summation and directed prosecutor to refrain from further improper statements, but defendant did not request any curative instruction

or move for a mistrial); *Charlemagne*, 2008 WL 2971768, at *7 (collecting New York state cases supporting this proposition); *cf. Montalvo v. Annetts*, No. 02 Civ. 1056 (LAK)(AJP), 2003 WL 22962504, at *21 (S.D.N.Y. Dec. 17, 2003) ("Even if the Court were to construe defense counsel's request at the end of trial for a curative instruction as sufficient objection, [petitioner's] habeas claim still is unpreserved for habeas review, since the trial judge gave the requested instruction and defense counsel failed to object to the curative instruction."). Despite objecting to some, although not all, of the allegedly improper statements, Smith did not request a curative instruction or move for a mistrial at any point, as New York courts commonly require. This indicates that the First Department's application of this rule was not exorbitant.

Third, and "most important," the court considers "the realities of trial," and where petitioner has substantially complied with the rule in question so as to effectuate the rule's underlying purpose, the court asks "whether anything would be gained by requiring" perfect compliance. *Lee*, 534 U.S. at 379, 382 (citation omitted). The state interest underlying the contemporaneous objection rule is "to ensure that the parties draw the trial court's attention to any potential error while there is still an opportunity to address it." *Cotto*, 331 F.3d at 245; *accord Garvey*, 485 F.3d at 720 ("The basis of § 470.05(2) is that the trial court must be given a fair opportunity to rule on an issue of law before it can be raised on appeal."); *Garcia*, 188 F.3d at 78 ("The Supreme Court has recognized that contemporaneous objection rules of this kind serve legitimate state interests.").

Although Smith objected to some of the prosecutor's statements, and the trial court made clear that it would instruct the jury on the law, Smith never requested a curative instruction or expressed any dissatisfaction with the instructions that were given. Thus, this case is unlike *Cotto*, in which the defendant had "made clear his position" on the relevant issue in pre-trial

proceedings, that position had been explicitly rejected by the trial court, and therefore the Second Circuit concluded that "once a party has made his position known to the court, the law does not require him to make repeated pointless protests after the court has ruled." *Cotto*, 331 F.3d at 241–42, 247 (citation and alteration omitted).

*Osborne v. Ohio*, 495 U.S. 103 (1990), underscores the distinction between *Cotto* and this case. In *Osborne*, the Court addressed two procedural failings. First, defense counsel had failed to request that the trial court instruct the jury on scienter. This omission, the Court held, was an independent and adequate procedural bar to federal habeas review of this issue. *Id.* at 123. Second, defense counsel had failed to object to the trial court's failure to issue an instruction on lewdness; however, defense counsel *had* filed a pre-trial motion on this issue, which was denied, and had thereafter proposed various jury instructions. As to that claim, the Court held, "nothing would be gained by requiring [defendant's] lawyer to object a second time." *Id.* at 124. The procedural default at issue in *Cotto* is like the second failing in *Osborne*—indeed, the Second Circuit in *Cotto* cited *Osborne* for this proposition. *See Cotto*, 331 F.3d at 246. But the procedural failure in this case is like the first in *Osborne*—Smith never requested a curative instruction regarding the prosecutor's allegedly improper statements. Although Smith objected to some statements during the summation, he never expressed to the court, either explicitly or implicitly, his position that curative instructions were warranted or that the court's instructions were in some way defective. By failing to raise the issue, Smith "violated the very essence of § 470.05(2)." *Garvey*, 485 F.3d at 720.

Accordingly, the First Department's application of the contemporaneous objection rule was not exorbitant in this case.

### 3.    Cause and Prejudice

Finally, Smith argues that his trial counsel's failure to request a curative instruction and to object to the court's failure to give one warrant a finding of ineffective assistance of counsel, which provides cause for Smith's default on state procedural grounds. *See* Pet. Reply Aff. ¶ 11.[12] Smith is correct that "[a]ttorney error that constitutes ineffective assistance of counsel is cause" for default. *Coleman*, 501 U.S. at 753–54. But "[a]ttorney error short of ineffective assistance of counsel [is] not." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). The Second Circuit has summarized the test for ineffective assistance of counsel as follows:

> Under *Strickland*, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he "must show that counsel's performance was deficient," so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) he must show "that the deficient performance prejudiced the defense," in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (internal citations omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 690, 694 (1984)).

Far from being constitutionally ineffective, Smith's trial counsel represented Smith competently and vigorously. That Smith's counsel, who otherwise peppered the record with objections, did not request a curative instruction or otherwise object to the trial court's jury instructions is not reflective of a deficiency on his part. Rather, as the First Department held, the prosecutor's "remarks . . . were fair comment on the evidence and a proper response to the arguments of defense counsel." *Smith*, 74 A.D.3d at 441. Smith's counsel was not constitutionally ineffective in failing to request a curative instruction regarding comments that the First Department held required no cure. Moreover, despite counsel's failure to make such a

---

[12] Smith does not argue that a fundamental miscarriage of justice would occur if this Court found his claim to be procedurally barred, nor would such an argument be persuasive here.

request, the trial court told the jury that it would instruct the jury on the law, *see* Tr. 887–90,

twice instructed the jury on the defense of justification, *id.* at 916–17, 1052, and twice reminded

the jury that the parties' summations are not evidence and that the jury must accept the law as the

court instructs, *id.* at 894–95, 1033. There is therefore no reason whatsoever to suspect that the

result of the proceedings would have been different if Smith's counsel had requested a curative

instruction, and thus no prejudice flows from his failure to do so. For these reasons, Smith's

ineffective assistance of counsel claim cannot provide cause for his procedural default.

Therefore, in addition to being untimely, Smith's claims are procedurally barred based on

adequate and independent state grounds.

### C.    Application of 28 U.S.C. § 2254(d)

Finally, in the interest of thoroughness, the Court addresses Smith's claim that the First

Department's alternative holding—that the prosecutor's statements and the trial court's failure to

give a curative instruction were not error—unreasonably applied clearly established federal law.

Pet. Reply Aff. ¶ 17.

Under AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim . . . resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established federal law

only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

a question of law or if the state court decides a case differently than [the Supreme] Court has on

a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A

state court decision is an "unreasonable application" of clearly established federal law "if the

state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The Supreme Court has described the test for habeas relief under § 2254 as one that is "difficult to meet" and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (citations omitted). Put differently, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). That standard is not met here.

   To the extent Smith is arguing that the prosecutor committed misconduct during his summation—either by invoking the number of stab wounds or by referencing the court's instructions regarding the law of justification—he must meet a high bar to show that such comments amounted to a constitutional violation: "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted). The prosecutor's remarks here fall well short of this standard. *See id.* at 180–81 (finding that petitioner was not deprived of a fair trial, despite observing that prosecutor's closing statement "deserves the condemnation it has received from every court to review it"; prosecutor's summation implied that death penalty would be the only guarantee against a future similar crime and included several offensive comments reflecting an emotional reaction to the case); *Donnelly v. DeChristoforo*, 416 U.S. 637, 640–45 (1974) (petitioner not deprived of fair trial despite

prosecutor's remark to jury that "[defendant and his counsel] said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder"; trial court had instructed jury that summations are not evidence and told jury to ignore the remark).[13] Indeed, the prosecutor's remarks here were largely responsive to defense counsel's summation, particularly defense counsel's remarks that "[t]here was only one fatal stab wound," Tr. 832; that "the rest came about incidentally," *id.* at 834; and that "[Smith] had an absolute right under the law and he was justified in terminating or preventing a burglary," *id.* at 823. *See United States v. Robinson*, 485 U.S. 25, 32–34 (1988) (holding that although it would be a constitutional violation for the prosecutor on his own initiative to ask the jury to draw an adverse inference from defendant's silence, no such violation occurs where prosecutor's comment on defendant's silence is a fair response to claim made by defense counsel, and observing that "it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another"); *Darden*, 477 U.S. at 182 (no violation where "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense"). Thus, the First Department did not unreasonably apply federal law in this respect.

To the extent that Smith argues that the trial court's failure to give curative instructions in response to the prosecutor's allegedly improper remarks was a due process violation, this argument fares no better. As noted, there was little to be cured. But even assuming that the remarks were in some way improper and a curative instruction was warranted under New York

---

[13] *See also Donnelly*, 416 U.S. at 646–47 (observing that summations "are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").

law, Smith has not established a right to relief based on the trial court's failure to issue a curative

instruction *sua sponte*: "Before a federal court may overturn a conviction resulting from a state

trial in which [an objectionable] instruction was used, it must be established not merely that the

instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some

right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*,

414 U.S. 141, 146 (1973); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas

corpus relief does not lie for errors of state law."). Petitioner's burden is "especially heavy"

where the claimed error is the failure to give an instruction, because "[a]n omission, or an

incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Smith correctly notes that the failure to instruct the jury on justification may constitute a

due process violation in some circumstances. *See, e.g.*, *Jackson v. Edwards*, 404 F.3d 612, 625

(2d Cir. 2005) (failure to charge jury on justification constituted violation of due process where

evidence could have allowed jury to conclude that petitioner acted with justification, and "in the

face of [petitioner's] confession, the jury could not acquit without having been instructed on

justification"); *Davis v. Strack*, 270 F.3d 111, 131 (2d Cir. 2001) (same, noting that trial court's

failure to issue justification charge "completely deprived [petitioner] of his highly credible

defense to the homicide charge and guaranteed his conviction").[14] But here, unlike in *Jackson* or

*Davis*, the trial court instructed the jury on the defense of justification—twice. *See* Tr. 916–17,

---

[14] In both *Jackson* and *Davis*, the Second Circuit held that it must resolve three questions in petitioner's favor in order to grant relief: (1) whether petitioner was entitled to a justification charge under state law; (2) whether the failure to give such a charge resulted in a denial of due process; and (3) whether the state court's contrary conclusion constituted an unreasonable application of clear Supreme Court precedent. *See Jackson*, 404 F.3d at 621; *Davis*, 270 F.3d at 124. Here, the court need not address whether a curative instruction was merited under state law, because the answer to the final two questions is a resounding "no."

1052. When Smith objected to the prosecutor's characterization of the law of justification during

his summation, the trial court reminded the jury that the court would instruct them on the

elements and that it was the People's burden to disprove Smith's justification defense beyond a

reasonable doubt. *Id.* at 890. The trial court also reminded the jury, twice, that statements made

in summations are not evidence. *Id.* at 894, 1033. Nothing about the trial court's instructions or

failure to issue further instructions "so infected the entire trial that the resulting conviction

violate[d] due process." *Cupp*, 414 U.S. at 147. Thus, there was no unreasonable application of

federal law.

Smith's petition is, therefore, denied on this independent ground.

### D.    Defendant's Persistent Violent Offender Sentence

After Smith's 2008 conviction, the trial court conducted a hearing at which it found that

Smith was a persistent violent felony offender based on his 1986 conviction for robbery in the

second degree and his 1993 conviction for criminal possession of a weapon in the second degree.

2008 Sent. Tr. 8–12; *see also* PVO Hearing Tr.  Although Smith did not challenge this finding on

direct appeal, he now argues that his sentence was improper, both because his 1993 plea was not

knowing and voluntary and because he was adjudicated[15] to be a youthful offender in 1993. *See*

Petition 4–5.[16]

---

[15] Whether Smith was actually adjudicated to be a youthful offender is unclear.  At the
conclusion of Smith's 1993 sentencing, the trial court stated:  "The record should reflect the
defendant was adjudicated a youthful offender." *See* 1993 Sentence Tr. 7.  However, that
appears to have been a misstatement.  According to Smith's 1993 plea, he was born February 8,
1967, making him 24 years old on the date the crime occurred, July 11, 1991. *See* 1993 Plea Tr.
3, 7.  During the plea, the court also noted that Smith was already a predicate felon, based on his
1986 conviction—Smith did not challenge that finding. *Id.* at 7–8.  Smith therefore would not
have been eligible to be a youthful offender, both an account of his age, *see* N.Y. Crim. P. Law §
720.10(1) (1993) (defining "Youth" as someone charged with a crime alleged to have been
committed "when he was at least sixteen years old and less than nineteen years old"), and his
prior felony conviction, *see* N.Y. Crim. P. Law § 720.10(2)(b) (1993) (defining "Eligible Youth"

32

To the extent Smith is challenging his 2008 sentence as improperly based on an invalid prior conviction, such a challenge may not be brought in a habeas petition: "[O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid." *Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 403 (2001). "If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained." *Lackawanna*, 532 U.S. at 403. That rule bars Smith's claim here.[17] *See id.*; *Valdez v. Hulihan*, 640 F. Supp. 2d 514, 516 (S.D.N.Y. 2009); *see also Fuller v. Brown*, No. 10-CV-0367T, 2011 WL 3862310, at *3 (W.D.N.Y. Sept. 1, 2011) (collecting cases).

Thus, Smith's challenge to his 1993 conviction, either on its face or as used to sentence him as a persistent violent felony offender, is unavailing.

---

as excluding one who has been "previously convicted and sentenced for a felony"). During Smith's 2008 predicate violent felony offender hearing, the court noted that it had reviewed the transcript of Smith's 1993 plea and sentence, *see* 2008 Sent. Tr. 9, but neither the court nor either party raised the issue of the reference to Smith's youthful offender status.

[16] To the extent Smith challenges the 1993 conviction itself, that challenge is time-barred. *See Ross*, 150 F.3d at 98, 103 (prisoners whose convictions become final before AEDPA's effective date have until April 24, 1997 to file their petitions). His § 440.10 application to the Supreme Court, Bronx County challenging his 1993 conviction, filed on June 1, 2011, *see* Petition 3, does not retroactively toll the limitations period that has already run. *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).

[17] *Lackawanna* discusses several exceptions to this rule, but none are applicable here. *See Lackawanna*, 532 U.S. at 404 (majority opinion) (recognizing exception where prior conviction was obtained against petitioner who was not appointed counsel); *id.* at 404–06 (plurality opinion) (suggesting exceptions where state court refused to rule on properly presented constitutional claim or where petitioner can show compelling evidence of actual innocence).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.  In addition,

the Court declines to issue a certificate of appealability.  Smith has not made a substantial

showing of a denial of a federal right, and appellate review is therefore not warranted.  *See* 28

U.S.C. § 2253(c); *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005).  The Court certifies,

pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good

faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.  *Coppedge v.

United States*, 369 U.S. 438, 445 (1962).


SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge


Dated: June 7, 2013
       New York, New York